Good morning, Your Honors, and may it please the Court, I'd like to reserve three minutes also for rebuttal. My name is Craig Garner, and I'm the attorney for New Method Wellness, the plaintiff and appellant in this case. I know that this case falls under, at least in the title of the calendar, under ERISA, but this is really a 12b6 motion case and a pleading standard. Unfortunately, the complexity of ERISA bleeds into this case just a bit, and this Court, I'm sure, is well familiar with the standards of review on a motion to dismiss from 12b6. ERISA applies. There's no special requirements for ERISA. However, we've got something along the lines of 100,000 published decisions since 1974 when ERISA was passed, and there are some concentric circles in which you've got 12b6 motions in ERISA, and that's where this abyss lies, and that's where this case exists. So is there a different standard of pleading than notice pleading for ERISA cases? There is not. Okay. But the reason I think the District Court made his ruling, and I will get to that in a moment, is because of the complexity of ERISA, which doesn't have a different standard, but it brings in different elements, and I'll explain. So the underlying actions, which is not at issue on 12b6, the contention that defendants violated the mental health parity laws and other things of that nature, that's the direct claim, but the ruling by the District Court really indirectly violates these parity laws as well as the Affordable Care Act, which amended ERISA when it was passed in 2010. So the two questions really, what is this case about, and what does the plaintiff or appellant believe, or why do we believe the District Court should be reversed? So in 2014, substance use disorder treatments and mental health benefit treatments became part of the essential health benefits for qualified health plans. They were required to be a part of health insurance plans going forward. And as a result, that became quite costly to a lot of these insurance companies. There is, this is a billion-dollar issue across the board. Isn't the core of this case that you claim that you were not paid the amount of money that you were entitled? You're claiming through the patients that you treated, the rights that they had. And so the core issue is whether or not you alleged enough facts to support a plausible inference under ICBAL that here was the amount you were supposed to get and here's the amount that you got. Explain to me why, as you cite the Inova case, why you're like the Inova case in laying out that plausible inference. And so what your statement is absolutely correct. That is what this case is about. The problem lies where plaintiff doesn't actually know the amount it is supposed to receive because that information exists with the defendant through these plan documents, these ERISA plan documents. But that doesn't excuse you from having to plead the plausible inference. And so the Inova case had the same problem, but the court there held that there was enough to draw the certain things that were in there. So tell me why you've alleged a similar plausible inference based on what you have. So what we've alleged in the complaint, this would be the Third Amendment complaint, that these patients were treated, the services that were provided in detail, and really there's only a handful of services that were provided. It's not like a hospital where there could be hundreds of different codes. We're talking about maybe less than 10 total with respect to these patients. The details of conversations that were had between individuals employed by plaintiff and individuals or agents of the defendants authorizing the services, benefits, making sure that they're insured. And then there was one ERISA plan that was produced in the case. So the answer to your question is how much more or how much were we supposed to get is something that, A, I would not be able to answer until I got the plans, and, B, even with the plans, I'm not sure I could answer because most of these... But the Inova plaintiffs, and again, that's a case you rely on, they said that it would be some formula based on reasonable and customary. Based on the market, it would probably be about 80%. I'm getting 11%. The inference is that I'm entitled to more. I mean, I don't know exactly how much, but it's a lot more than 11, so I've pled enough. How are you like that? Did you show that kind of a gap, that something must be up, that it's so far that I must be entitled to more, even if I can't tell you the exact formula yet? Sure. And with respecting the patient privacy, so not listing the names individually as a deal, I believe, at some point, but yes, we allege the amount at issue that we were paid and what we were not paid and the difference that was there. But you said you listed for each of those patients the amount you billed, but in Inova, what was alleged was what was reasonable and customary for that, because your bills may be excessive. That's why I'm wondering, did you bring yourself within Inova? So to answer that, what's reasonable and customary, Your Honor, is we've got 40 years of history in a hospital setting, and they still can't quite figure that out. And this is just starting in mental health and behavioral health. You've got dozens and dozens of cases leading up to Central California Children's Hospital and Blue Cross, which I believe was a 2016 or 2014 decision in state court in California. You've got nothing comparable to that. Although on the one hand, you also have the mental health parity laws that say that these insurance companies have to treat or have to provide the same level of care and benefits to mental health as they do medical surgical. How they compare a case of schizophrenia versus an appendectomy is a different issue, but that's not really what's on a 12B6 motion. So plaintiff alleged everything that it could possibly have alleged without the plans, and even if it had the plans, it would have had to say what's reasonable and customary. That's going to be an expert who's going to come in and say, this is what's reasonable and customary for this kind of a procedure. There may be issues of medical necessity and things of that nature, but without the plans, we are to a certain extent flying blind, I guess, but even with the plans, we still would rely upon experts to make that determination because it's not so clear. So I have two questions with respect to your allegations. One of your allegations is that the hospital verified coverage with the insurer before providing the services. What was that verification? Is this to amount or is this to the type of services that would be provided? It was not a hospital. I mean, it was a treatment center. A phone call would be made. Usually maybe the back of the card would have a number, and so one thing they would do would verify that there were benefits, verify they're covered by the plan first. Sometimes they'll get information about how much is covered, and that usually comes in the form of a certain percentage of reasonable and customary, which doesn't really give us an answer as to how much in dollars, but at least we know that there are some benefits. There's no plan documents exchanged. They're just telephone conversations, and the main purpose is to make sure that they're covered by the insurance. That's really the gist of it. They might get co-pay information or deductible information, but they're not going to get it's for this amount of money, and this is what you... And even if they were given it over the phone, they would still need to verify it at some point based upon some written document, some plan document. And then when you say they failed to fully reimburse, so you had a certain amount, and they reimbursed you for another amount. So, yes, you're correct. There was full charges that were part of the complaint, and whether those were too high or too low, that's something that's not an issue right now, because that would actually be another thing that would be an expert witness would testify. But you demonstrated in your complaint that there was a discrepancy. Correct. You submitted higher and they gave you lower. Substantial discrepancy, and a substantial delta as to what was billed and what was paid. And it varied. Some were paid more than others, but they were all underpaid, and they were underpaid substantially in some cases, and I don't have the exact percentages in front of me, but some of them were extremely low, and some of them were just low. Let me just clarify this. You are an out-of-system provider, correct? That's correct. All right, so you have no idea what this insurance company, the defendant in this case, Cigna, pays its in-system providers because that's proprietary, correct? It's plans allegedly are proprietary. So they won't give you the information? They'll let us know maybe that they're covered, and they might let us know, but they won't give us the plans. They don't give you the numbers, okay? So that's completely within their purview, but they're saying they don't have to give it to you because it's proprietary. And you're billing, and what you bill, you believe is fair and reasonable. That's uncontested. That's what you believe because that's what you're billing, right? And that's what they always bill. Right. And so to know what this plan believes is fair and reasonable, you need to look at their records and they won't give them to you. That is correct, Your Honor. Okay. And our position is that that information is within their purview, their knowledge, and their notice of it. So under the standards of a 12B6 motion, they have notice of everything that they need to respond to the complaint or the operative complaint. What about the exhaustion issue? They say that perhaps you could have gotten this plan information had the claims been adequately exhausted. So the exhaustion of administrative remedies is something, it's a process of simply appealing the claims. And I don't believe these, this process never involved voluntarily, the plans ever voluntarily providing the plan, the actual plan documents. They'll appeal it, they'll get information, maybe submit medical records, they'll be back and forth, but it does not include this exchange of information like the plan documents themselves. But the appeals, don't the appeals have to come from the patient and not the provider? The patient assigns to the provider their right to do the appeals. Okay, so you can provide, you can do the appeals on behalf of the patient. And they do, and that's what happens, correct. And if you had done that administrative appeal for these patients, you would have learned more about how they calculated the amounts, wouldn't you? Not necessarily. We would learn when an appeal is done or when an explanation of benefits is provided, there's maybe four or five different denial reasons or whatever, some medical necessity might be it, reasonable customary terms might be used, we don't know what that is, or paid at the percentage under the plan, but not being able to see the plan document, or just a flat out denial. But we would not get any of the information that we would need to be able to specifically allege exactly how much money to which we would be entitled. And would, so I mean, I have my fair share of insurance policies that I've looked at. And I'm just wondering whether the exact amount that they would reimburse for each type of treatment would even be listed in the policy, or rather, or instead, would there be something in there to the effect that Cigna would pay the usual reasonable customary amount for these services and not give any specific dollar amounts in any event? Some plans may have had, maybe some grandfathered plans, may have had specific numbers. But I think since the mental health parity laws are in effect, I'm not really sure that's something that they can do. I think that they have to put reasonable and customary just to preserve any issue there. So when Judge Guilford wanted you to amend to say specific terms of the policy or the plan, what terms did he want you to put in there, other than we know it's going to reimburse for the usual reasonable, why do you have to type in the exact language? Well, we had one policy upon which it relied, and that was, I believe, in one of the earlier motions to dismiss the Marriott plan, and that was, and we don't think that was the one that was the same as all of them, but that's all we had to work with. I mean, in a perfect world, we would amend the complaint, file all the plans under seal, and be able to... I'm just wondering why, even under ICBAL, you need to put in specific terms. I mean, we know what the reimbursement amount is going to be, and what is usual, reasonable, and customary for these services is going to be some medical expert. And therein lies that abyss between ERISA and 12B6, and that's where it gets confusing, but it's not. It's just a 12B6 motion. That's all this really is. All right.  Yes, please. Thank you, Your Honor. Good morning, Your Honors. My name is Emily Costin, and I represent the Cigna appellees, all three of them. I'll refer to them collectively as Cigna this morning. I think I'd like to start with addressing what Judge Collins raised, which is, how have they alleged a plausible claim here based on the plan terms that they have specifically alleged in the complaint, and those are in the Marriott plan. So, with respect to the one patient who is a patient under the Marriott plan, the Marriott plan provides a definition of what is reasonable and customary. Reasonable and customary is not an amount that is in a book off the shelf somewhere. It is a defined term in the plan, and it is defined in the plan as the lesser of the billed customary amount that Cigna determines is allowed based on a variety of factors, including this database that they use that is constantly updated, the geographic region, the services rendered. And then on top of that, that particular plan, the Marriott plan, indicates it might only be 50% of that if that specific individual has not met their out-of-pocket maximum yet. So, here, with respect to the one patient that's alleged in the complaint, I think his name is BH, New Method has alleged that they only received 40% of what they billed for the services rendered. Well, 40% is completely consistent with the Marriott plan terms. The plan terms say the allowed amount if it's lesser than the billed amount, and even then it might only be 50% if that individual hasn't met their out-of-pocket maximum. So, to your point, New Method has not alleged a plausible claim here with respect to the one patient that participates in the one plan that they have alleged. I didn't read your brief as saying that ANOVA was distinguishable. I read it as saying that just ANOVA was wrong. Correct. Do you think you can distinguish ANOVA and its logical premise that when the gap is so big, even if I don't know the exact formula, I've pled enough that something's wrong and I get to go forward? I understand that point. We have distinguished ANOVA in our papers. I think that ANOVA was wrongfully decided based on the law because it relied on language from the Braden case, which refers to claims under breach of fiduciary duty under ERISA, not claims for benefits under ERISA. And claims for benefits under ERISA, the plaintiff, whether or not it's a medical provider or it's an individual participant, must plead specific plan terms that explain why it's entitled to the benefits. One example they have, they've, you know, they billed $1,200, which they, you know, allege is a reasonable amount for that. And what they get back is $100. Why isn't that a big enough gap to trigger the ANOVA type inference? So I think it goes to the point I think that Judge Battalion was making this comment, that it might be what they believe is a reasonable and customary amount, but I would remind the court again here about the relationships between the parties. Cigna does not have a relationship with New Method. It does not have a relationship with any of its out-of-network providers. So there is no incentive for an out-of-network provider to bill a, quote, reasonable amount because it could just increase its prices to whatever it wants to charge because it doesn't have an agreement with Cigna. It has no contract. It has no relationship. It also has no obligation and has no relationship to even take Cigna patients. If an out-of-network provider like New Method chooses to accept a Cigna patient that walks in the door, then it must understand it is only going to be reimbursed according to the terms of the plan that that specific individual participant's plan allows. Now, if they had administratively pursued these claims, is it clear that they would have gotten the plan terms or a sufficient explanation of the determination of benefits in the formula for each of those claims? There are very specific procedures for administrative exhaustion in the plans, and each one of those administrative procedures differs by plan. Again, each one of these plans is individually negotiated contracts between an employer, plan sponsor, and Cigna, and there is an administrative process. And in that back-and-forth administrative process, the claimant, whether that be the participant or an authorized representative like a lawyer or New Method, if they had the proper authorization to pursue those appeals, in response we get a more fulsome explanation than what is provided on the original explanation of benefits, which might include clear plan language that says this is the plan language that says how this is priced. It might also include specifics about that individual. So I used the patient before. There may be something in the plan that says that patient hasn't met their out-of-pocket maximum yet, they haven't hit their deductible, that's why the pricing is different. And in fact, in the third amended complaint, New Method does some illustrations of some specific plaintiffs and says this patient we only received 10%, this patient we only received 40%, some of them they received upwards of 50% or 60%. And all that does is illustrate that each one of these plans is unique, and each one of them depends upon the specific circumstances of the individual and their unique situation. But aren't they supposed to, aren't you supposed to reimburse fair and reasonable if they're out of system, regardless of the plan? As long as there's coverage, as long as there's coverage, you're supposed to give a fair and reasonable compensation to out-of-system providers. Fair and reasonable being what's defined in terms of the plan as fair and reasonable. And in this specific instance, as they've alleged, that term, reasonable and customary, Your Honor, is actually defined in the plan. Each different plan has a different definition of what's fair and reasonable, despite the statute. There's no statute about reasonable and customary. I understand. And that's based on a formula that's updated all the time, and that formula is proprietary. Yes, what we have to go on here, all we have to go on here is what they've alleged in the Third Amendment complaint. And what they've alleged in the Third Amendment complaint as a representative language, and there are a host of reasons why that language is not representative of all of the other ERISA plans at issue. But the language that they've cited is, there is a term that is defined, what is reasonable and customary, and what they're entitled to receive. This isn't some amorphous amount in the industry that they can just say, we think reasonable and customary for this service is $1,000, you should pay us $1,000. Reasonable and customary is defined in the plan as what they've billed, the lesser of what they've billed, versus what CIGNA determines as reasonable and customary, based on all these factors. So why can't you, based on this, say, answer this complaint and just say, we pay, we deny all these allegations because we paid the fair and reasonable amount, and that's all we owe you? Why can't we just answer the complaint? I mean, why isn't there enough in the Third Amendment complaint for you to answer it? To me, they're saying, you underpaid us, and your response is, not according to our proprietary information, we didn't underpay you. It's not about our proprietary information, it's about whether or not they've stated a claim under ERISA by making a plausible claim. They haven't alleged a plausible claim based on the one patient that does belong in that plan, and that's frankly what it voluntarily requires. Well, I read it, and I thought, I mean, to me, the plausible inference is, you didn't pay them the reasonable amount you would have paid had they been in your network. But they're not in network. Right, but that's their contention. Now, you're disarguing with me, but, I mean, you could just as easily, you know what they're contending. But nothing in the complaint says that Cigna has to pay out-of-network providers what they pay their in-network. I'm not saying that, but I'm saying, they're saying they got less than you're obligated to pay them. They're saying. Go ahead. Oh, I'm sorry. They're saying in their briefing, we got paid less than what we billed. And what I'm saying is that that's not a plausible claim under the terms of the plan that they've alleged, because the terms of the plan they've alleged says that's what the plan says we're going to pay. And they're an out-of-network provider. There is no link there. Cigna has no obligation to this out-of-network provider, and for the same reason this out-of-network provider doesn't have an obligation to Cigna. They don't have to take Cigna patients. So if they take Cigna patients, they're at risk that they're not going to be reimbursed? They're not at risk that they're not going to be reimbursed anything, and that's not with the complaint. It sounds like what you're saying is that Cigna will reimburse exactly what it feels like, reimbursing out-of-network providers. Cigna will reimburse in accordance with the plans, and that's exactly what the Third Amendment complaint alleges. These pre-service phone calls that Your Honor was asking about earlier, first of all, Cigna can't over the phone agree to pay a specific amount because the services haven't even been rendered yet. They're calling in advance saying, we have a Cigna patient that just walked in the door. We want to know if they have coverage, and the allegations make clear that Cigna confirmed they're covered. But then the only statements that are alleged in the complaint are that Cigna confirmed they will pay the usual or customary amount as it is defined in the subject plans. And it is their decision at that point in time to accept a Cigna patient, but they don't have to accept a Cigna patient. They've also alleged two other alternatives in the complaint that they could have done. Number one is that they can always require the patients to self-pay up front, and the patients can come seek reimbursement from Cigna. The other thing they can do that they've alleged in the complaint is that they can require the patients to sign a form that they'll pay whatever differential based on what Cigna pays. But what this is coming down to is that Cigna doesn't have a contract with this out-of-network provider. It has not agreed to pay them any amount. Cigna only has an obligation to its plan sponsors and to the participants who participate in those plans. And their obligation to that plan is to only pay what they're contractually obligated to pay out of the health fund. Whatever that is for the out-of-system provider. As defined in the plan. But the plan, nobody knows what the plan is except you, and you won't tell anybody about how you came up with what is reasonable and customary. That's not true. The participants have every right and access to get the plan documents. But not the provider. If the provider was authorized on behalf of the participant with some sort of a power of attorney or as an authorized representative, they could. But there's no allegation here that they had that authorization. ERISA requires only that these plan documents be provided to participants and beneficiaries so that they can understand their rights and obligations under the terms of the plan that they belong to. The provider is not a party to this. This is an agreement between Cigna and all of these different employer plan sponsors. And each one of these plans is individually negotiated. This is proprietary information, whether or not Marriott offers certain benefits to its employees versus Samsung offering certain benefits to its employees, and at what points and what they cover and whether they're fully insured or self-insured. Each one of these plans is a contract that is proprietary. And Cigna does have an obligation under ERISA to release that information to the participant or its authorized representative. But it doesn't have an obligation to release these records to an out-of-network provider. I'm happy to take any more questions, but I would urge the court, I would like to address Judge Collins' comment about the Inova case that is cited by New Method in their opening brief. We distinguished the Inova case in our responsive brief, and New Method has done nothing to distinguish it upon reply. I would also urge the court to take a look at the Sanctuary Surgical Center case, which we cited in our brief out of the 11th Circuit. The Sanctuary Surgical case affirmed a series of four cases that were filed against Cigna, Aetna, Blue Cross, and United, similar situation on their failure to allege the plan terms. And it went up to the Supreme Court, and the petition for the Supreme Court raised this very issue. If providers don't have access to plan documents, how are they supposed to make those allegations without discovery? And the Supreme Court denied cert. All right. Thank you. Thank you. I'll be very brief, Your Honor. Thank you. One thing I wanted to note is I think the issue is not whether or not New Method Wellness had the right to treat the patients. The real question is the patients had the absolute right to seek treatment from New Method Wellness, whether or not they're in-network or out-of-network. That's the one thing that may be missing at times. And as far as reasonable and customary, I am sure there is a set of rules in the various plans. We just don't know them. Why didn't you invoke the patients' rights to get the documents? I mean, you have a contractual relationship with them, and as a condition of service, you could insist that they get them. Did you make any efforts to do that? There were some efforts made, Your Honor, but sometimes patients aren't alive. Sometimes the patients are no longer in the state. It varies, but I still believe that it's the obligation of CIGNA, of the defendant, to actually produce this information for us because they're the ones who have it. They're on notice of it, and so they're the ones who really should be providing it. There's two cases. I did make a request for judicial notice of one other case, I believe, in the pleadings. Another case was decided in June in the Central District on similar issues where plans weren't produced, and that court also denied the motion to dismiss on the ERISA claims based upon that similar fact that the plans were in the possession of the actual defendants. But in terms of reasonable and customary, I mean, it's taken almost 40 years to try to get there for hospitals, and they're not quite there yet. It's not so simple, and the formulaic response by counsel isn't really the – until we see the plans, that's just the beginning, and then it does become an expert issue. It becomes a factual issue, but we didn't even get a chance to go there. This is, again, just a motion to dismiss. I can't answer any other questions, but on that, I just request that this court reverse and let us give us a chance to actually try this case. All right. Thank you, counsel. A new method of wellness will be submitted.
judges: Wardlaw, Bataillon, Collins